# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REV. CHARLES E. LARSEN *et al.*,     :
                                  :
              Plaintiffs,        :     Civil Action No.:     02-2005 (RMU)
                                  :
              v.              :     Document Nos.:     48, 51
                                  :
THE UNITED STATES NAVY *et al.*,     :
                                  :
              Defendants.     :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
### DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

This matter comes before the court on the parties' cross motions for summary judgment.
The plaintiffs, Charles Larsen, Gregory McNear and James Linzey, are three non-liturgical
Protestant ministers who applied for but were denied commissions in the Navy Chaplain Corps
(the "Corps" or "Chaplaincy").[1]  They bring suit against the Navy and the Secretary of the Navy
(collectively, the "defendants") to challenge alleged prejudice in Corps hiring practices.
Specifically, the plaintiffs allege that the Navy has established religious quotas for Navy chaplain
accessions that intentionally favor liturgical clergy in violation of the First and Fifth
Amendments.[2]  The parties now each seek summary judgment.  Because the Navy's current
chaplain accession program seeks legitimate military ends while accommodating individual
rights to an appropriate (albeit limited) degree, the court grants the defendants' motion for

---

[1]     On May 1, 2006, the parties filed a stipulation of dismissal as to a fourth plaintiff, David
Myers, which the court approved that same day.

[2]     On November 18, 2004, the court dismissed the plaintiffs' claims under the Religious
Freedom Restoration Act.  Mem. Op. (Nov. 18, 2004).

summary judgment and denies the plaintiffs' motion for summary judgment.

## II.   BACKGROUND

### A.   Factual Background

Because the facts of the present case are similar to several cases now pending before this

court, the court limits its discussion of the plaintiffs' allegations to what is necessary to resolve

the instant motion.

The plaintiffs are non-liturgical ministers, all with prior military service.  Compl. ¶ 1.

They applied to the Corps at various times in their careers, but the defendants rejected them

because, the plaintiffs allege, of a "systematic and pervasive religious prejudice" against non-

liturgical faith groups.  *Id.* ¶ 2.  As part of this prejudice, the Navy favors liturgical Protestants,

despite the under-representation of liturgical Protestant service personnel and an over-

representation of non-liturgical Protestant service personnel in the Navy generally.  *Id.* ¶¶ 1-2.

The Defense Manpower Data Center ("DMDC") collects data on the religious preferences

of individual Armed Forces members for the Department of Defense ("DOD").  *Id.* ¶ 8.

According to the plaintiffs, this data indicates that:

> In stark contrast to their low and declining percentage of [Navy] personnel, the
> Protestant liturgical chaplain category consistently comprises over 33% of the
> Chaplain Corps, about three times the actual percentage of [Navy] personnel who
> identify a religious preference.  In contrast, non-liturgical chaplains have never come
> close to an equivalence of their faith group percentage of those who identify a
> religious preference.

*Id.* ¶ 13.

The plaintiffs claim that the over-representation of liturgical chaplains stems from the Navy's conscious decision to insure that liturgical chaplains control the Corps. *Id.* ¶ 18. "Prior to some time around 1988," the defendants based the composition of the Corps on the religious demography of the country. *Id.* ¶ 16. Because proportional representation led to an increased number of non-liturgicals, the Corps became "concern[ed]." *Id.* ¶ 17. The defendants thus abandoned their goal of proportional representation and, in 1988, imposed a "subjective quota system," Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 4, known as the "Thirds Policy," *id.* ¶ 18. Under this policy, the defendants divided the Corps into thirds: Roman Catholic, Protestant liturgical, and non-liturgical Christian and Special Worship. *Id.* Since the defendants implemented their Thirds Policy, their accession goals for chaplain candidates have not only been arbitrary, but have also been a "deliberate misrepresentation of the Navy's free exercise needs . . . for the purpose of minimizing the career opportunities for non-liturgical clergy and . . . limit[ing] their influence in the Corps and in the Navy, and hinder[ing] the religious rights of non-liturgical personnel." *Id.* ¶ 22. In 2001, the Navy abandoned the Thirds Policy, preferring instead to "take the best qualified candidates, regardless of denomination." Pls.' Mot. at 6.

With regard to the individual plaintiffs, Rev. Larsen spent sixteen years in active duty in the Navy. Compl. ¶ 4(A). He left in 1982 to attend the Dallas Theological Seminary and complete the post-graduate education necessary to become a Navy chaplain. *Id.* While at Dallas Theological Seminary, Rev. Larsen applied to the Navy's Student Seminary Program, but he was not accepted. *Id.* In 1987, after graduating from Dallas Theological Seminary, Larsen applied to join the Corps, but the Corps rejected him with a letter stating that his non-liturgical faith group had "no quota." *Id.*

3

Rev. McNear served in the Air Force and the Colorado Air National Guard prior to completing seminary in 1981.  *Id.* ¶ 4(B).  In 1993, he applied to the Navy to become a chaplain, but he was told he needed additional post-graduate semester hours to meet the Corps' criteria. *Id.*  Rev. McNear promptly completed these requirements and reapplied.  *Id.*  The Navy rejected his application because, among other things, Rev. McNear was too old and did not satisfy the "needs of the Navy."  *Id.*, Ex. 8 ¶ 2.  According to the plaintiffs, the age explanation was a "sham" because liturgical Protestant candidates received waivers to join the Corps despite their age during the same period, and the "needs of the Navy" is a "code-phrase" for an illegal quota system disfavoring non-liturgical Protestants.  Compl. ¶ 4(B).

Finally, Rev. Linzy is endorsed by the Chaplaincy of Full Gospel Churches, a non-liturgical group.  *Id.* ¶ 4(D).  He spent three years of active duty as an Army chaplain and applied to become a Navy chaplain.  *Id.*  The Navy rejected his application – despite a shortage of chaplains – and explained to Rev. Linzy that he would have been viewed more favorably if he were a "baby baptizer" – that is, if he were *not* non-liturgical.  *Id.*; *see also* Compl. ¶ 7(A) (noting that liturgical denominations are sometimes referred to as "high church" or "baby baptizers").

### B.   Procedural Background

The court last issued a memorandum opinion in this case on November 18, 2004, denying in part and granting in part the defendants' motion to dismiss.  In their motion to dismiss, the defendants moved for dismissal for lack of subject-matter jurisdiction and failure to state a claim on which relief can be granted.  Mem. Op. (Nov. 18, 2004).  Specifically, the defendants argued that the court lacked subject-matter jurisdiction over the plaintiffs' demand to be commissioned as officers, *id.* at 7, that sovereign immunity barred the plaintiffs' request for monetary damages,

4

*id.* at 9, that the plaintiffs failed to allege immediate or imminent injury necessary for constitutional standing, *id.* at 12, that the plaintiffs' claims were barred by the applicable statute of limitations, *id.* at 20, and that the plaintiffs had failed to state a claim under the Religious Freedom Restoration Act, *id.* at 22.

Regarding subject-matter jurisdiction, the court construed the plaintiffs' complaint as seeking the opportunity to compete for commission in the Corps rather than, as the defendants had argued, asking the court to actually commission the plaintiffs in the Navy. *Id.* at 7-8.  Noting the court's jurisdiction to entertain such claims, *id.* at 7 (citing *Emory v. Sec. of the Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987)), the court denied the defendants' motion for dismissal.  Because the plaintiffs never served as Navy chaplains, the court ruled that monetary damages (in the form of constructive and retirement credit), are inappropriate.  Mem. Op. (Nov. 18, 2004) at 11 (citing 5 U.S.C. § 702).

With regard to standing, the court concluded that the plaintiffs' pleadings sufficed, at the motion to dismiss stage, in alleging a concrete plan to reapply to the Corps if the court ordered the Navy to remove the unconstitutional barriers they allege.  *Id.* at 17.  With this assessment, the court concluded that the plaintiffs' alleged harm was sufficiently imminent to establish standing. *Id.*  Finally, the court granted the defendants' motion to dismiss the plaintiffs' Religious Freedom Restoration Act claims, concluding that the plaintiffs do not challenge a law of neutral or general applicability – a prerequisite for suits under that statute.  *Id.* at 24-26.

### III.   ANALYSIS

Because of the procedural complexity of this case, the court takes a step back to briefly recount the plaintiffs' existing claims.  The plaintiffs argue that the defendants' past Thirds Policy and its current chaplain accession plan violate the First and Fifth Amendments.  Compl. ¶¶ 24-45.  They seek declaratory relief, injunctive relief and an order from the court directing the defendants to eliminate current and past bias and to provide certain remedies to the plaintiffs.  *Id.* at 24.  As to declaratory relief, the plaintiffs request a judgment that: (1) the Navy's accession policies violate the First and Fifth Amendments, and DOD regulations; (2) the Navy has unlawfully denied Rev. Larsen an opportunity to compete for the Seminary Program, a commission, a career, and a promotion; (3) the Navy's conduct has denied the other plaintiffs an equal opportunity to compete for a commission; and (4) the Navy has unlawfully caused Rev. McNear to lose a career in the Naval Reserve.  *Id.* at 24-25.  As to injunctive relief, the plaintiffs ask the court to stop the defendants from discriminating in chaplain accession and career development decisions and to stop the defendants from deriving accession goals that are not based on the Navy's religious needs.  *Id.* at 25-26.  Finally, the plaintiffs ask the court to order the defendants to eliminate vestiges of discrimination, develop a neutral accession system based solely on the religious needs of the Navy Corps and to allow the plaintiffs the opportunity to be commissioned as chaplains if they are otherwise qualified.  *Id.* at 26-27.

From a legal perspective, the plaintiffs' case boils down to a constitutional challenge to the Navy's now-extinct Thirds Policy and its current chaplaincy accession policy.  The parties have filed cross-motions for summary judgment.  The court now turns to the merits of those motions.

## A.    Subject-Matter Jurisdiction

Before tackling the merits of the plaintiffs' claims, the court must consider the defendants' arguments that the court lacks subject-matters jurisdiction.  Specifically, the defendants argue that the plaintiffs' claims are barred by sovereign immunity, Defs.' Mot. for Summary J. ("Defs.' Mot.") at 7, and that the plaintiffs lack standing to challenge both the Navy's past and its current hiring practices, *id.* at 10.

### 1.    Legal Standard for Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### 2.   The Plaintiffs' Claims Are Not Barred by Sovereign Immunity

The defendants argue that the court lacks subject-matter jurisdiction over the plaintiffs' challenge to the Navy's accession practices because "it seeks to completely overhaul the Navy's system of commissioning new officers into its Chaplaincy Corps – a policy constitutionally and statutorily committed to the Navy's discretion[.]" Defs.' Mot. at 7.

At its heart, the plaintiffs seek to compete for a position without the Navy subjecting them to an allegedly unconstitutional hiring practice. Such a claim is precisely within the ambit of the federal judiciary. *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (stating that "this Court has never held, nor do we now hold, that personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service"); *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) (noting that "courts have shown extreme reluctance to interfere with the military's lawful exercise of its discretion over internal management matters," but pointing out that this principle "is wholly inappropriate . . . when a case presents an issue that is

8

amenable to judicial resolution.  Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged").

The defendants rely on *Orloff v. Willoughby*, in which the Supreme Court noted that "Congress has authorized the President alone to appoint Army officers in grades up to and including that of colonel, above which the advice and consent of the Senate is required." *Id.* at 8 (quoting *Orloff v. Willoughby*, 345 U.S. 93, 91 (1953)).  In *Orloff*, the Court found it "obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief." *Orloff*, 345 U.S. at 91.  Despite the seeming unequivocal nature of *Orloff*, however, this circuit has made clear that "[s]ince *Orloff*, the doctrine of nonreviewability of military decisions has undergone considerable modification, as courts have evinced increased willingness to review military actions alleged to contravene express constitutional, statutory or regulatory requirements." *Blevins v. Orr*, 721 F.2d 1419, 1421 (D.C. Cir. 1983).

In short, and contrary to the defendants' assertion, "[i]t is the duty of the federal courts to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious or contrary to the statutes and regulations governing that agency." *Dilley*, 603 F.2d at 920.  Balanced against the Supreme Court's caution in *Orloff*, the court's role here is "limited but crucial." *Ridgely v. Marsh*, 866 F.2d 1526 (D.C. Cir. 1989) (quoting *Blevins*, 721 F.2d at 1421).  Accordingly, the court rejects the Navy's contention that its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged.

### 3.   Standing

9

The defendants claim that the plaintiffs lack standing to challenge the Navy's accession practices because they have "failed to demonstrate that they face a concrete likelihood of future injury[.]" Defs.' Mot. at 10.  In essence, the defendants claim that the plaintiffs can show neither immediate or imminent injury nor redressability.  *Id.*  Though the court previously rejected the defendants' challenge to the plaintiffs' standing, its analysis focused on the burdens attending the plaintiffs at the motion to dismiss phase of the litigation, rather than at the motion for summary judgment phase.  Because the plaintiffs' burden of demonstrating standing is greater at the summary judgment phase, *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002), the court must consider the issue anew.

### a.    Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies.  U.S. CONST. ART. III, § 2, cl. 1.  These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam).  The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club*, 292 F.3d at 898-99.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct

suffice.  *Id.*

To demonstrate standing, a plaintiff must satisfy a three-pronged test.  *Id.*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560).  First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical.  *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103).  Second, the injury must be fairly traceable to the governmental conduct alleged.  *Id.*  Finally, it must be likely that the requested relief will redress the alleged injury.  *Id.*  Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing."  *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001).  Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]."  *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

### b.   The Plaintiffs Have Standing to Challenge the Navy's Current Policy

The defendants argue that the plaintiffs lack standing to request prospective relief because the possibility of future harm is speculative or hypothetical.  Defs.' Mot. at 11 (citing *City of L.A. v. Lyons*, 461 U.S. 95 (1983)).  The court previously considered this issue in addressing the defendants' motion to dismiss and concluded, noting the procedural posture of the case at that time, that general factual allegations of injury resulting from the defendants' conduct may suffice, "for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Mem. Op. (Nov. 18, 2004) at 16 (quoting *Lujan*, 504 U.S. at 561).  Thereafter, the court projected that "at the summary judgment stage, the

court could not construe the plaintiffs' 'interest[] in becoming chaplains' more favorably than the 'some day' plans in *Lujan* – plans which, the Court in *Lujan* noted, lacked concreteness 'or indeed even any specification of *when* the some day will be.'" *Id.*

In assessing standing, the court must consider whether the plaintiffs plan to reapply to the Corps – and, if they do plan to reapply, whether their plan is a mere "some day" intent or hope, or something more – something concrete. *Lujan*, 504 U.S. at 564. An inquiry into the plaintiffs' plan necessarily centers around the plaintiffs' intentions. *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003).

Recognizing the scant record concerning the plaintiffs' intentions on reapplying to the Navy Chaplaincy, the court previously ordered briefing as to "whether each plaintiff is 'able and ready' to apply for a Navy chaplain commission." Order (Aug. 9, 2004). The court's inquiry stemmed from the Supreme Court's explanation in *Gratz* that a plaintiff had standing to seek prospective relief if the plaintiff could demonstrate that he is "able and ready" to apply if the allegedly discriminatory impediment was removed. *Id.* In response, on August 23, 2004, the plaintiffs submitted a memorandum accompanied by declarations from each plaintiff responding to the court's inquiry that "'yes', I am 'able and ready' to apply for a Navy chaplain commission." Pls.' Supplemental Mem. (Aug. 23, 2004), Ex. 2 ¶ 3; *see also id.* Exs. 3 ¶ 3 & 5 ¶ 3.

Despite the plaintiffs' assertions, the defendants contend that the plaintiffs' readiness and willingness to reapply to the Navy remains speculative. Defs.' Mot. at 12. Although the court concurs with the government's assessment, this characterization does not damn the plaintiffs' standing because the nature of the prospective standing inquiry is inherently speculative,

concerning the subjective intent of the suing party.  The speculative quality of the plaintiffs'

assertions notwithstanding, the plaintiffs' declarations constitute "direct testimonial evidence" of

their intent to reapply, *Arrington*, 473 F.3d at 338, which suffices in defeating summary

judgment,[3] *Anderson*, 477 U.S. at 255 (noting that in considering a motion for summary

judgment, the court must draw all justifiable inferences in the nonmoving party's favor and

accept the nonmoving party's evidence as true); *see also, Gratz*, 539 U.S. at 282 (Stevens, J.,

dissenting) (noting that the plaintiff in *Grutter v. Bollinger*, 539 U.S. 306 (2003), succeeded in

demonstrating standing through a declaration that the plaintiff  "still desires to attend the Law

School and become a lawyer").

One final note regarding the plaintiffs' readiness to reapply.  The defendants argue that

for various reasons the plaintiffs do not currently meet the basic threshold qualifications for

acceptance into the Navy chaplaincy.  Defs.' Mot. at 17-18.  For example, the defendants argue

that defendants McNear and Larson both fail to meet the current age requirement for accession,

---

[3]     The court notes that the ability of litigants to gain standing by simply declaring their
readiness and willingness reduces the standing assessment from the traditional bleeding
plaintiff inquiry, to a formulaic pleading requirement.  Such superficial formality is
equally present in the traditional standing inquiry.  *Cf.* B. Woodward & S. Armstrong,
*The Brethren* 192 (1981) (noting Justice White's rhetorical question asking "[w]hy
didn't the Sierra Club have one goddamn member walk through the park and then there
would have been standing to sue?").  Indeed, the court is at a loss to see how a Sierra
Club members' walk through the park creates real skin in the game.  And with advice of
half decent counsel, it seems doubtful that any litigant would fail to demonstrate standing
under the current doctrine (e.g., an attorney advising his client to walk through the park
or invoke the buzz words "ready and able" before initiating suit).  Nevertheless, the
Supreme Court has instructed that a litigant has standing by demonstrating readiness and
willingness to compete, *N.E. Fl. Chapter of the Assoc. Gen. Contractors of Am. v. City of
Jacksonville, Fl.*, 508 U.S. 656, 666 (1993), and it is not to this court to second guess that
determination, *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (indicating that Supreme Court
precedent "must be followed by the lower federal courts no matter how misguided the
judges of those courts may think it to be").

that Larson has been unable to obtain an ecclesiastical endorsement, that McNear has not

remained in touch with his endorser since first applying to the chaplaincy in 1996, and that

McNear has not been hired by a congregation as a pastor.  *Id.*

The current Navy Instruction governing basic qualifications for chaplain accession is

Secretary of the Navy Instruction 1120.9 ("SECNAVINST 1120.9").  Defs.' Reply in Supp. of

Mot. to Dismiss ("Defs.' Reply") at 6, n. 4; Ex. A.  The current policy requires that applicants

"be able to complete 20 years of active service by age 68."  *Id.*, Ex. A at 4.  To the defendants,

plaintiffs McNear's and Larson's current ages disqualify them from consideration in the

chaplaincy, and in turn, strip them of standing in this case.[4]  Defs.' Mot. at 18.  The court is not

persuaded.  Though SECNAVINST 1120.9 has an age requirement which plaintiffs McNear and

Larson apparently do not satisfy, that age requirement is not absolute: the Navy can waive this

requirement if, *inter alia*, "extraordinary circumstances cause such a waiver to be in the best

interests of the Naval Service" or "[w]hen a gross inequity to the applicant would otherwise

result."  Defs.' Reply, Ex. A at 4.  The defendants argue that this exception poses no loophole for

the plaintiffs because the fact that the Navy *can* grant a waiver on a case-by-case basis does not

mean that all candidates are entitled to one.  *Id.* at 7.  Though the defendants are correct that the

waiver does not create a rule, their argument misses the point.  Because the court's immediate

---

[4]      The defendants cite to portions of McNear's and Larson's depositions which do not exist
        in the record.  For example, the defendants cite McNear's deposition at pages 87-88,
        Defs.' Mot. at 18, but the excerpt provided skips from page 50 to page 94.  Defs.' Mot.,
        Ex. 3.  Likewise with regard to plaintiff Larson, the defendants cite to Larson's
        deposition at page 174, Defs.' Mot. at 18, but the excerpt provided ends at page 149.
        Defs.' Mot., Ex. 4.  For this reason, though the court presumes that plaintiffs McNear
        and Larson do not qualify under the Navy's age requirement, nothing provided by the
        defendants in the record confirm this fact.

inquiry concerns the plaintiffs' standing to bring suit, not the merits of their case, the court's

inquiry focuses not on whether the Navy must grant an age waiver to McNear and Larson, but

whether such a waiver is possible. *Ranger Cellular v. F.C.C.*, 348 F.3d 1044 (D.C. Cir. 2003)

(recognizing standing if there is a "realistic possibility" of competing).

The plaintiffs cite numerous instances in which otherwise age disqualified candidates

received a waiver from the Navy. Pls.' Reply at 17-18. Because circumstances exist under

SECNAVINST 1120.9 under which the Navy would consider McNear and Larson despite their

age, their non-qualification under SECNAVINST 1120.9 does not divest them of standing.

To the defendants, the plaintiffs also fail to meet threshold requirements concerning

current ecclesiastical endorsements and physical fitness. Defs.' Mot. at 18. The defendants

support these claims with citations to non-existent pages of their exhibits. *See Infra.* at n.4.

Moreover, the defendants cite no cases suggesting that the plaintiffs must meet every procedural

and ministerial prerequisite for application at every stage in a litigation alleging a more grievous

and fundamental impediment to their candidacy. Accepting the defendants' arguments would

mean that a plaintiff seeking the opportunity to compete must satisfy all of that job's other

qualifications throughout the litigation.

Although the plaintiffs bear the burden of demonstrating standing, the court cannot

scrutinize their standing under the defendants' particularized arguments without evidentiary

support. It suffices for the court that the plaintiffs declare their present desire, their readiness and

their willingness to apply. *Gratz*, 539 U.S. at 282 (Stevens, J., dissenting). The court presumes

that if the time came for the plaintiffs to reapply, they would align all of their ducks regarding the

Navy's procedural prerequisites for applicants; they would update their resume, they would

renew their ecclesiastical endorsements, they would spit-shine their shoes, and yes, they would

get in shape.  For purposes of standing, the court only assess whether it is possible for the

plaintiffs to meet the eligibility requirements of the Navy, not whether they currently meet every

last one.

### c.    The Plaintiffs Lack Standing to Challenge the Navy's Thirds Policy

Part of the plaintiffs' case challenges the constitutionality of the Navy's now-

decommissioned Thirds Policy.  Pls.' Mot. at 13-27.  The purpose of that policy, as the plaintiffs

see it, was "to have the Navy Chaplain Corps reflect the religious denominational and faith group

makeup of the American population."  Pls.' Statement of Facts in Supp. of its Mot. for Summ. J.

at 39.  To implement the policy, the plaintiffs contend, the Navy used a formula for computing

the accession targets for each of the faith groupings to achieve congruity with the religious

demographics of the nation at large.  Pls.' Mot. at 3.  The plaintiffs challenge the Thirds Policy

by providing statistical evidence demonstrating a systematic favoritism for liturgical Protestants

at the expense of non-liturgical Protestants.  *See id.* 17.

For their part, the defendants provide their own set of statistical evidence which they

contend proves that these accession goals "played no role in determining which candidates

received commissions."  Defs.' Mot. at 41-45.  At the summary judgment stage, the court's role

is not to evaluate the parties' evidence or draw factual conclusions.  FED. R. CIV. P. 56(c).  And a

proper evidentiary evaluation of the parties' evidence and expert testimony would ultimately fall

to a fact finder, at a later stage in litigation.  As elaborated below, however, because the Navy

voluntarily abandoned its Thirds Policy and because the plaintiffs present no evidence showing

that the Navy took this action merely to avoid judicial review, the plaintiffs' challenge to this

policy is moot.

### i.    Legal Standard for Mootness

Article III's case-or-controversy requirement prohibits courts from issuing advisory

opinions or decisions based on hypothetical facts or abstract issues.  *Flast v. Cohen*, 392 U.S. 83,

96 (1968).  "The doctrine of mootness is a logical corollary of the case or controversy

requirement[.]"  *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986).  In cases

where challenged conduct ceases and "there is no reasonable expectation that the wrong will be

repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the

prevailing party, and any opinion as to the legality of the challenged action would be advisory."

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  Accordingly, a court may not rule on the

merits of a case in which the claim for relief is moot.

Courts must evaluate mootness "through all stages" of the litigation to ensure that a live

controversy remains.  *21st Century*, 318 F.3d at 198 (citing *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) and *Lewis v. Cont'l Bank Corp.*, 494 U.S.

472, 477 (1990)).  As a result, "[e]ven where litigation poses a live controversy when filed, the

[mootness] doctrine requires a federal court to refrain from deciding it if 'events have so

transpired that the decision will neither presently affect the parties' rights nor have a more-than-

speculative chance of affecting them in the future.'"  *Id.* (quoting *Clarke v. United States*, 915

F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally

cognizable interest in the outcome."  *City of Erie*, 529 U.S. at 287 (internal quotations omitted).

An intervening event may render a claim moot if (1) there is no reasonable expectation that the

conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs,, Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992). A case is not moot, however, so long as any single claim for relief remains viable, as the remaining live issues satisfy the case-or-controversy requirement. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 978 (D.C. Cir. 1991) (internal quotations and citations omitted). The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458-59 (D.C. Cir. 1998).

### ii. The Plaintiffs' Challenge to the Navy's Thirds Policy is Moot

To the extent that the Navy ever employed a Thirds Policy in its chaplain accession decisions, a fact the parties dispute, this policy has "since been replaced by the current faith group-neutral system[.]" Defs.' Mot. at 18; *see* Pls.' Mot. at 6 (recognizing that the "[d]efendants abandoned any [faith group cluster] specific accession goals or targets" in 2001). In this case, the plaintiffs seek to enjoin the Navy from utilizing unconstitutional policies so that the plaintiffs can compete for membership in the Corps. *See* Mem. Op. (Nov. 18, 2004) at 7 (construing the plaintiffs' complaint as "seeking to compete for a position without the Navy subjecting them to an allegedly unconstitutional hiring practice"). Because the Thirds Policy is no longer in service, an injunction would serve no purpose. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108-109 (1998).

In *Steel Co.*, the plaintiff challenged a steel manufacturer's failure to report toxic and

18

hazardous chemical storage end emissions statistics as required by statute.  After the plaintiff

initiated suit, the steel manufacturer voluntarily submitted its reports.  For this reason, the Court

ruled that injunctive relief – "aimed at deterring petitioner from violating [the relevant statute] in

the future," was insufficient for purposes of Article III standing.  *Id.*, at 108-109.  In the case, the

United States, speaking through an amicus brief, argued that "there is a presumption of [future]

injury when the defendant has voluntarily ceased its illegal activity in response to litigation."  *Id.*

at 109 (correction in original).  Characterizing this argument as creating a "sword out of a

shield," the Court ruled that "[i]t is an immense and unacceptable stretch to call the presumption

[of future injury] into service as a substitute for the allegation of present or threatened injury

upon which initial standing must be based."  *Id.* (citing *Lyons*, 461 U.S. at 109).

Had the plaintiffs in the present case alleged that "a continuing violation or the

imminence of a future violation, the injunctive relief requested would remedy that alleged harm."

*Id.* at 108.  But like the plaintiff in *Steel Co.*, the plaintiffs here do not allege that the Navy plans

to reinstate its challenged Thirds Policy.  For this reason, the plaintiffs' challenge to the Navy's

Thirds Policy is not redressible by court-ordered injunctive relief, and is, therefore, dismissed as

moot.

**B.     The Defendants Are Entitled to Summary**

**Judgment as to the Navy's Current Practice**

Having resolved the requisite jurisdictional issues, the court turns now to the pending merits upon summary judgment. Simply put, the issue before the court is whether the Navy's current chaplain accession practice violates the Constitution.

**1.   Legal Standard for a Motion for Summary Judgment**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on

summary judgment.  *Id.*

The moving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record, *Green*, 164 F.3d at 675 (quoting *Harding v. Gray*, F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Green*, 164 F.3d at 675.

> ### 2.   Appropriate Legal Standard of Review for Assessing the Plaintiffs' Establishment Clause and Free Exercise Clause Claims

Under the current naval policy, the Navy "takes the best qualified candidates, regardless of denomination."  Pls.' Mot. at 6; *see also* Defs.' Mot. at 26 (indicating that the policy "does not set any accession goals, guidelines, or quotas for chaplain applicants from any denomination, faith group, or faith group category").  Whereas the Navy's goal in the formerly-employed Thirds Policy was to link the composition of the Navy Chaplaincy to the religious denominational demographics of the community generally, the Navy currently "considers numerous factors" in deriving its chaplaincy accession needs.  *Id.* at 30.  These factors include: "the breadth of locations where Navy personnel serve," "the unique circumstances of Naval service, which involves personnel isolated on ships sailing all over the world," "the various functions and tasks of chaplain officers outside of religious services including assistance to those of other faith groups and even no faith groups," "the need to keep accession, promotion, and retention in line with other naval communities," the need to prevent shortages of qualified clergy," "the need to

21

maintain capacity to respond to events requiring quick access to chaplains from different faith groups not stationed on site, such as terror attacks," and "the need to consider administrative necessities in managing an all-volunteer corps."  *Id.* (citing exhibits 14 and 16).

In assessing the constitutionality of the Navy's current practice, the court turns to case law concerning the First Amendment's religion clauses.  The court ferociously guards the constitutional command that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"  U.S. Const. Am. I.  Congress "may justify an in-road on religious liberty [however] by showing that it is the least restrictive means of achieving some compelling state interests."  *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).  "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation[.]"  *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)).  Ordinarily, in considering a claim of religious infringement, the court does not take the government's word at face value, but instead conducts an independent inquiry to assess its plausability.  *Id.* (noting that certain stated justifications for infringement on religious liberty would likely not suffice in justifying the infringement and recognizing the government's burden of showing that no alternatives existed to meet those justifications); *see also, Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (recognizing that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion").

When the claims of religious infringement are levied against the military, however, the

Supreme Court has charted a far different course.  Noting that "the military is, by necessity, a specialized society separate from civilian society," *Parker v. Levy*, 417 U.S. 733, 743 (1974), the Supreme Court declared that judicial review of challenges to military action "is far more deferential than constitutional review of similar laws or regulations designed for civilian society," *Goldman v. Weinberger*, 475 U.S. 501, 508 (1986); *Steffan v. Perry*, 41 F.3d 677, 692 (D.C. Cir. 1994) (recognizing the highly deferential standard set forth in *Goldman* and that "even the First Amendment must yield at times to the exigencies of military life").

In *Goldman*, the Supreme Court considered a challenge to an Air Force regulation mandating uniform dress for Air Force service members.  Goldman, an orthodox Jew, challenged this regulation because, in application, it prevented him from wearing a Jewish head covering, the yarmulke.[5]  Justice Stevens, concurring with the majority's disposition, rendered a concise background of the case:

> [Goldman's] devotion to his faith is readily apparent.  The yarmulke is a familiar and accepted sight.  In addition to its religious significance for the wearer, the yarmulke may evoke the deepest respect and admiration – the symbol of a distinguished tradition and an eloquent rebuke to the ugliness of anti-Semitism.  Captain Goldman's military duties are performed in a setting in which a modest departure from the uniform regulation creates almost no danger of impairment of the Air Force's military mission.  Moreover, on the record before us, there is reason to believe that the policy of strict enforcement against Captain Goldman had a retaliatory motive – he had worn his yarmulke while testifying on behalf of a defendant in a court-martial proceeding.

---

[5]     "Yarmulkes are generally understood to be a form of religious observance.  They are commonly seen and accepted in today's society wherever Orthodox Jews are found."  *Goldman v. Weinberger*, 475 U.S. 501, 511 n. 1 (1986).  These head coverings are the "symbol of [a] faith whose roots are as deep and venerable as Western civilization itself [constituting a] symbol of a great faith from which Western morality and the Judeo-Christian tradition have arisen."  *Goldman v. Sec. of Defense*, 739 F.2d 657 (1984) (Starr, J., dissenting from denial of rehearing *en banc*).

With these facts, Justice Stevens editorialized that this was "an especially attractive case" justifying judicial rebuke of the challenged military policy. *Id.* at 511 (Stevens, J., concurring). Nevertheless, Justice Stevens joined the majority in concluding that Goldman's religious liberties in wearing his yarmulke, an unquestioned hallmark of his religious faith, yielded to the military's decision to institute a uniform dress policy which lacked an exception for religious attire. *Id.* at 511-512. Recognizing that such regulations "may be more objectionable" for the plaintiff, the Court nonetheless took the view that the Air Force's policy, which "encourages the subordination of personal preferences and identities in favor of the overall group mission," was paramount. *Id.* at 508.

In reaching this decision, the Supreme Court rejected the traditional "strict scrutiny" analysis in favor of a more deferential analysis. *Id.* at 507-508. In *Orloff*, the Supreme Court had recognized that "the very essence of compulsory service is the subordination of the desires and interest of individual to the needs of the service." *Orloff*, 345 U.S. at 91. In *Goldman*, the Court extended this reference to "desires and interests" to servicemen in the practice and religious commands of their religious faith. *Goldman*, 475 U.S. at 507 (quoting *Orloff*). In short, because "within the military there is simply not the same [individual] autonomy as there is in the larger civilian community . . . when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 508 (citing *Parker*, 417 U.S. at 751).

The plaintiffs advocate the use of the traditional strict scrutiny analysis. Pls.' Mot. at 13.

24

And to distance themselves from *Goldman*, they simply ignore it.[6]  Nowhere in the plaintiffs'

motion for summary judgment, their opposition to the defendants' cross-motion for summary

judgment, or their reply in support of their motion for summary judgment do the plaintiffs

distinguish, let alone cite, *Goldman*.  The plaintiffs, instead, cite a litany of cases for the

proposition that the court must apply strict scrutiny when a plaintiff alleges preferential treatment

based on denominational membership (*a.k.a.*, "denominational preference" cases).  Pls.' Mot. at

14 (citing *Larson v. Valente*, 456 U.S. 228 (1982), *Hernandez v. C.I.R.*, 490 U.S. 680, 685

(1989), *County of Allegany v. Am. Civil Liberties Union*, 492 U.S. 573, 608-609 (1989), and

*Bowen v. Kendrick*, 487 U.S. 589, 623 (1988)).  The cases cited by the plaintiffs, however,

concern constitutional challenges to government conduct outside of the military context.  The

irreducible fact remains that claims of religious infringement to military conduct occupies a

---

[6]      The plaintiffs cite *Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972) to support their
contention that the court need not defer to the military's judgment.  Pls.' Mot. at 10.  The
plaintiffs' reliance on *Laird* is misplaced.  In *Laird*, the D.C. Circuit invalidated a
program requiring military cadets at the United States Military Academy at West Point,
New York, the United States Naval Academy at Annapolis, Maryland, and the United
States Air Force Academy at Colorado Springs, Colorado, to attend religious services.
The Circuit's decision, comprised of separate concurring opinions by Judges Bazelon
and Leventhal, ruled that the forced attendance law violated the Establishment Clause.
*Laird*, 466 F.2d at 290.  Judge Bazelon held that compulsory church attendance was
"absolutely proscribed by the Establishment Clause."  *Id.*  Yet Judge Bazelon also
recognized that if the program's purpose was "of preserving the right to free exercise of
religion," it would be constitutionally permissible.  *Id.*  In fact, as if prescient to the facts
of this case, Judge Bazelon continued that "accommodation of the Establishment Clause
to permit maintenance of religious personnel and institutions within the military is
necessitated . . . by the mandate of the Free Exercise Clause that soldiers be given the
opportunity to worship."  *Id.* n.36.

         Judge Leventhal, for his part, ruled that the compulsory church attendance requirement
violated the Establishment Clause, but predicated his ruling on the fact that the military
had demonstrated no "military necessity" for the program.  *Id.* at 297.  Here, by contrast,
the Navy explicitly rests their chaplaincy program on such claims of military necessity.
*See supra* at 27-28.

judicial space of their own.[7]

The plaintiffs' argument for strict scrutiny has some doctrinal appeal given the breadth of cases applying the strict scrutiny analysis. But the ubiquity of strict scrutiny does not prove its application absolute. Along with *Goldman*, the Supreme Court has applied one form or another of relaxed scrutiny "in several cases involving discrete categories of governmental action in which there are special reasons to defer to the judgment of the political branches." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 571 n.5 (1993). And with regard to cases concerning the religion clauses, "rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." *Waltz v. Tax Comm'n*, 397 U.S. 664, 669 (1970). Therefore, "short of those expressly proscribed governmental acts, there is room for play in the joints productive of a

---

[7]     The plaintiffs advocate the use of strict scrutiny because the Navy's accession program, in practice, suggests statistical denominational preference. Pls.' Mot. at 13-14 (citing *Larson v. Valente,* 456 U.S. 228, 246 (1982)). A suggestion of denominational preference, demonstrated through statistics, would complicate the court's analysis, and perhaps require judicial application of strict scrutiny, *Orloff* and *Goldman* notwithstanding, *see Waltz v. Tax Comm'n*, 397 U.S. 664, 669 (1970) (noting that the "course of constitutional neutrality in this area cannot be an absolutely straight line"). If a plaintiff happened into court with hard statistics showing that a current military program worked a statistically significant disparity in treatment between members of different faiths, perhaps the scales would tip away from deference to military judgment and in favor of judicial stewardship of individual rights. Without suggesting that a statistical suggestion of denominational preference would spur the court to conduct fact finding in a battle between statistical experts, the court leaves this determination for another court on another day.

Such a circumstance does not exist in the present case, however. Here, though the plaintiffs allege that the previously utilized accession program created denominational preferences, *see generally*, Pls.' Mot. at 2, the plaintiffs own data shows that under the Navy's current accession policy, accession rates among applicants of different faith groups have "converged," and any previously existing statistical differences "have dissipated," Pls.' Stmt. of Facts ¶ 126 (quoting Pls.' Mot. Ex. 28 (Leuba Decl.) at 65 ¶ CP12).

benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.*

The plaintiffs misread the court's August 22, 2002 Memorandum Opinion in the related *Adair* case as endorsing a strict scrutiny analysis for the present case. In that ruling, the court mentioned strict scrutiny within the context of delineating the plaintiffs' initial burdens in avoiding a pre-discovery summary judgment challenge. *Adair v. England*, 217 F. Supp. 2d 7, 14 (D.D.C. 2002). That analysis is not at all applicable in the current context, in which the court has occasion to reach the constitutional merits of the case.

In a Memorandum Opinion issued on January 10, 2002 in *Adair*, the court suggested that relaxed scrutiny as articulated in *Goldman* did not apply to the military chaplaincy cases. The court's determination was based, in part, on the nature of the defendants' stated justifications at the time for its policies. *Adair v. England*, 183 F. Supp. 2d 31 (D.D.C. 2002) (noting that the challenged regulation in *Adair* involved "considerations that are not related to strictly military affairs or to the defense of the country"). There, the government "never tr[ied] to articulate how the challenged policies and practices – e.g., alleged religious preferences for liturgical Christian chaplains – would further any operational, strategic, or tactical objectives." *Id.* Without the Navy demonstrating a link between the chaplaincy and strategic or national defense concerns, the court was left to conclude that the Navy's interest in creating the chaplaincy constituted only "quality-of-life issues" which were "designed to hire, retain, and promote chaplains to satisfy the religious needs of Navy service members." *Id.* Now, by contrast, the court has before it the Navy's stated justifications for its policy: "Chaplains help prepare and maintain sailors' and marines' ability to engage in combat and other tactical, strategic, and operational missions,

directly tying chaplains to the Navy's ability to defend the nation."  Defs.' Mot. at 28.  The court

takes the Navy's statement at its word.  *Goldman*, 475 U.S. at 507-509 (instructing that "courts

must give great deference to the professional judgment of military authorities concerning the

relative importance of a particular military interest").  Accordingly, the court concludes that the

Navy's interest in developing a chaplaincy is akin to the Air Force's needs in mandating

standards of uniformity at play in *Goldman*; that is, it concerns "operational, strategic, or tactical

matters."  *Goldman*, 475 U.S. at 507-509; *see, e.g.*, *Katcoff v. Marsh*, 755 F.2d 223, 237 (2d Cir.

1985) (recognizing that "the morale of our soldiers, their willingness to serve, and the efficiency

of the Army as an instrument for our national defense rests in substantial part on the military

chaplaincy, which is vital to our Army's functioning").  For this reason, the relaxed scrutiny

employed in *Goldman* is the appropriate level of judicial scrutiny in evaluating how the Navy

goes about implementing those goals.

  The court has one additional justification for its conclusion.  In *Grutter v. Bollinger*, the

Supreme Court recognized with approval the assertion of high ranking retired military leaders

that a "highly qualified, racially diverse officer corps . . . is essential to the military's ability to

fulfill its principle mission to provide national security."  539 U.S. at 329.  Both affirmative

action programs designed to promote diversity in the military officers corps and the Navy's

current chaplaincy accession program do not instinctively implicate national security the way, for

example, troop assignments, rules of engagement, or weapons procurement might.  But just as

the Supreme Court credits the statements of former military officials in asserting that maintaining

racial diversity promotes national security, so too does this court credit the Navy's "tying

chaplains to the Navy's ability to defend the nation."  Defs.' Mot. at 28.  In a very real sense, in

other words, the Navy's stated interest in operating a chaplaincy corps (which may involve

incidental religious discrimination) resounds with equal force as the military's interest in seeking,

fostering, and promoting racial diversity in its officers corps (which may involve incidental racial

discrimination).  *See Grutter*, 539 U.S. at 329.  In both cases, military service demands "the

subordination of the desires and interests of the individuals to the needs of the service."  *Orloff*,

345 U.S. at 92.

   **3.    The Defendants' Current Navy Accession Policy Survives Constitutional Scrutiny**

        Because religion clause cases engender "room for play in the joints," *Waltz*, 397 U.S. at

669, the court begins its analysis with mention of the constitutional context of this case.  The

realities of maintaining a military in a religiously pluralistic nation places the government in a

delicate constitutional position given the Establishment Clause and the Free Exercise Clause.  On

the one hand, "[s]pending federal funds to employ chaplains for the armed forces might be said

to violate the Establishment Clause."  *Abington Sch. Dist. v. Schempp*, 341 U.S. 203, 308-09

(Stewart, J. dissenting).  "Yet a lonely soldier stationed at some faraway outpost could surely

complain that a government which did *not* provide him the opportunity for pastoral guidance was

affirmatively prohibiting the free exercise of his religion."  *Id.* (emphasis in original); *see also*,

844 (Brennan, J., concurring) (recognizing that the military chaplaincy constitutes a practice

"conceivably violative of the Establishment Clause [but] the striking down of which might

seriously interfere with certain religious liberties also protected by the First Amendment").  It is

in the space between the constitutional command against practices respecting an establishment of

religion and the command against practices which prohibit the free exercise thereof that the

military chaplaincy rests.  With this fundamental understanding of the constitutional difficulties

attending the Navy chaplaincy program in mind, the court proceeds.

The plaintiffs challenge the Navy Chaplaincy's current open accession system, which "takes anybody who comes along," by arguing that it lacks a sufficient nexus to the actual Department of Navy free exercise needs – "the constitutional compelling purpose for the Chaplaincy Corps." Pls.' Mot. at 41. Without this nexus, the plaintiffs argue, the Navy "cannot show their means is narrowly tailored to the accomplishment of [the Chaplaincy Corps'] function." *Id.* The plaintiffs ask the court to declare the current system constitutionally invalid and order the Navy to adopt a system tailored narrowly to the Navy's actual free exercise needs.

The plaintiffs' argument, as the court sees it, is this: under normal circumstances, the government may not finance religious programs. The military context, however, constitutes an exception to this general rule because accommodating the free exercise needs of military service members is itself a "compelling interest." Pls.' Mot. at 41-42. To the plaintiffs, in applying the traditional strict scrutiny analysis, the military's accommodation of free exercise (the "compelling interest" in the strict scrutiny analysis) must be narrowly tailored to survive constitutional scrutiny. *Id.* In other words, the Navy is constitutionally permitted to operate a military chaplaincy *only if* it can narrowly tailor its chaplaincy program to the purpose for its creation – the actual free exercise needs of the military service. *Id.* The court does not share the plaintiffs' understanding.

### a.   Distinguishing Between Permissive and Mandatory Accommodation

Before evaluating the Navy's chaplaincy program under the relaxed scrutiny standard set forth in *Goldman*, the court takes a moment to highlight an inconsistency in the plaintiffs' constitutional argument which permeates their claims and, ultimately, leads inexorably to its

failing.  The plaintiffs argue vigorously that the Navy's chaplaincy program serves a compelling interest in satisfying the religious needs of Naval service members.  Pls.' Mot. at 6.  But to the plaintiffs, that chaplaincy program must be narrowly tailored to the free exercise needs of the military service members it serves.  The problem in this approach is that it equates the Navy's compelling interest in organizing a chaplaincy with a constitutional instruction requiring it.  In other words, the plaintiffs argument confuses that which the constitution permits and that which it requires.

When the plaintiffs argue that the Navy's chaplaincy satisfies a compelling purpose, they speak of this compelling purpose not in permissibly accommodating the religious needs of the Navy, but in satisfying the constitutional *requirement* that the Navy accommodate the religious needs of its service members.  *See, e.g.*, Pls.' Mot. at 43 (arguing that chaplaincy must meet "the specific or expected Free Exercise needs of [Navy] personnel").  To be clear, the plaintiffs never expressly argue that the Navy must establish a chaplaincy to accommodate the religious needs of the Navy.  But their arguments imply it.

The difference is crucial.  If the Navy were constitutionally required to organize and constitute a chaplaincy, so as to ensure the free exercise rights of its service members, then the chaplaincy program would have to not only be narrowly tailored to the free exercise needs of the Navy's service members, it would have to be in relative synergy with it.  *Church of the Lukumi Babalu Aye, Inc.,* 508 U.S. at 562 (noting that a proactive component of the Free Exercise clause is to safeguard religious liberty, which "generally require[s] government to accommodate religious differences").

If, as is the case here, the Navy is permitted, but not constitutionally required, to

accommodate religious needs of its members via a chaplaincy program, the Navy's program need not satisfy every single service members' free exercise need, but need only promote free exercise through its chaplaincy program. The program is constitutionally sound if it simply works toward accommodating those religious needs. *See* Arlin Adams, *The Doctrine of Accommodation in the Jurisprudence of the Religion Clauses*, 37 DEPAUL L. REV. 317, 319 (1988) (discussing the differences between permissive and mandatory religious accommodation).

To be sure, the court would evaluate how well the chaplaincy program accommodated the service's religious needs whether the chaplaincy was constitutionally required or constitutionally permitted. But if the constitution required a military chaplaincy, a single service member's lack of access to clergy (or any religious need for that matter) would suffice in invalidating the program as a whole. Likewise, if a chaplaincy were constitutionally required, the court would invalidate the program on the suggestion that another means would accomplish greater free exercise ends.

The plaintiffs cite *Katcoff* to support their claim that the Navy's chaplaincy must be narrowly tailored to the religious needs of Naval service members. Pls.' Mot. at 19. In *Katcoff*, the Second Circuit expressed its view that the constitution mandated a military chaplaincy. *Katcoff*, 755 F.2d at 234. The court stated that if the military did not organize a chaplaincy, "the effect of compulsory military service . . . would deprive the soldier of his right under the Establishment Clause not to have religion inhibited and of his right under the Free Exercise Clause to practice his freely chosen religion." *Id.* For two reasons, the court avoids a direct evaluation of this legal assertion. First, though the plaintiffs in *Katcoff* were not conscripted to military service, the court qualified its exposition of constitutional rights to those serving in

32

"compulsory military service."[8]  *Id.*  Perhaps in compelled military service situations the

Supreme Court's sanction of "the subordination of the desires and interests of the individual to

the needs of the service," *Orloff*, 345 U.S. at 92, would resound with less force.  But because the

plaintiffs in the instant case are not conscripted service members arguing the subversion of their

religious freedoms, the court does not have occasion to evaluate the *Katcoff* court's statement

regarding the constitutional requirements placed on the government in draft service situations.

Second, the plaintiffs do not expressly argue that the free exercise clause requires a

military chaplaincy.  Without an explicit argument in this regard, the court does not opine as to

the constitutional dimensions of the chaplaincy on such sweeping terms.  *Mazer v. Stein*, 347

U.S. 201, 206, n. 5 (1954) (noting that the court does not "reach for constitutional questions not

raised by the parties").

According to the Navy, given the diversity of religious beliefs and geographic dispersion

of the military, it would be "impossible in any given military unit or community to provide a

chaplain for each faith group represented by its members."  Defs.' Mot., Ex. 15 at iv.  The court

accepts the Navy's assertions in this regard, *see Orloff*, 345 U.S. at 92, and the Navy's arguments

convince the court in their own right that stationing a chaplain wherever a service member needs

one would be a logistical nightmare the execution of which would significancy and perpetually

---

[8]        With minor historic exceptions, however, our military is a volunteer organization.  See
*Holmes v. United States*, 391 U.S. 936 (1968) (Douglas, J., dissenting in the denial of
certiorari) (recounting the history of conscripted military service in the United States).
In volunteering, military service members must understand and accept that "the military
'is the executive arm' whose 'law is that of obedience.'"  *Parker v. Levy*, 417 U.S. 733,
749 (1974).  The court sees no principled reason why this logic would not apply to
civilians who are attempting to gain admission into the military, one of its services, or a
specialized corps within one of those services.

strain military resources.  For these various reasons, in evaluating the Navy's chaplaincy program, the court need not assess whether it is perfect in its accommodation of service members' free exercise needs, just whether it is sufficiently tailored to the Navy's interest in permissibly accommodating those religious needs.[9]

### b.  The Navy's Chaplaincy Program Satisfies the *Goldman* Standard

Under a relaxed standard of review, the court assesses whether "legitimate military ends are sought to be achieved," and whether the program "is designed to accommodate the individual right to an appropriate degree."[10] *Goldman*, 475 U.S. at 505 (quoting *Goldman v. Sec. of Def.*, 734 F.2d 1531 (D.C. Cir. 1984)).  Assessing the Navy's current chaplain accession system under this two part test, the court rules that it is constitutionally sound.

First, the court rules that the Navy's chaplaincy system seeks "legitimate military ends."[11] *Id.*  According to the government, supported by affidavit, the chaplaincy furthers the Navy's mission of national defense.  Defs.' Mot. at 28.  Marine Brigadier General Joseph Dunford, for

---

[9]   In addition to confusing permissive and mandatory accommodation, the plaintiffs' argument is not persuasive because it relies, at its core, on the application of strict scrutiny.  But as the court previously ruled, strict scrutiny analysis does not apply in this case given the judicial deference accorded the military in decisions concerning military affairs and the understanding that service in the military implies a measured reduction in the rights of service members.  *See* discussion infra at 21-28.

[10]   Justice O'Conner, dissenting in *Goldman*, lamented the majority's holding because "[n]o test for free exercise claims in the military context is even articulated, much less applied."  *Goldman*, 475 U.S. at 528 (O'Conner, J., dissenting).  Be that as it may, yet seeking precedential guidance as to the applicable standard of review, the court applies the legal test employed by the D.C. Circuit in its opinion in the case, which the Supreme Court affirmed.

[11]   The plaintiff seemingly concedes this point by recognizing that the military chaplaincy constitutes a compelling military interest.  Pls.' Mot. at 10.  Nevertheless, the court's holding does not depend on this concession.

example, recognizes that the chaplaincy's contribution to the military "directly influences the will of the individual Marines to fight and the combat effectiveness of our units." *Id.,* Ex. 12 ¶ 2. General Dunford continues that prior to deployment of Marines in the current imbroglio in Iraq, "chaplains were essential in the development of combat leadership, combat stress training, family readiness, and a wide range of other areas.  Because chaplains participate in every aspect of unit training, the contribution they make is truly immeasurable." *Id.*  He continues with a detailed and thoroughly convincing assessment of the necessity of the Navy Chaplaincy Corps. According to Department of Defense findings presented in its Study of Representation of Religious Faiths in the Armed Forces, Navy Chaplains

> [P]rovide for the religious and moral needs of military personnel, their families, authorized Department of Defense civilians, and retired personnel, with primary attention given to the welfare of the service member.  They conduct services of worship, administer rites and sacraments consistent with the chaplains' faith group, and provide a full range of religious activities.  They serve as personal counselors and as leaders in religious education and humanitarian services.

Defs.' Mot., Ex. 15 at 3.  With these statements, the court concludes that the Navy's interest in maintaining a chaplaincy is important, it is compelling, and therefore, at an irreducible minimum, serves legitimate military ends.  *Goldman*, 734 F.2d at 1535; *Katcoff*, 755 F.2d at 234.

The second prong of the court's inquiry evaluates whether the program is "designed to accommodate the individual right to an appropriate degree." *Goldman*, 475 U.S. at 505.  The *appropriate* degree of accommodation depends, of course, on the military's need for its program and the compatibility of that program with individual needs.  In *Goldman*, the Air Force's strict application of its dress code regulation in practice foreclosed *any* accommodation of individual rights.  But such absolute non-accommodation was constitutionally permissible, the court ruled,

35

because "the First Amendment does not require the military to accommodate such practices in the face of its view that they would detract from the uniformity sought by the dress regulations." *Id.* at 508.

A review of the Navy's current chaplaincy accession policy satisfies the court that it is likewise "designed to accommodate the individual right to an *appropriate* degree." *Id.* a 505. Navy "[c]haplains help prepare and maintain sailors' and marines' ability to engage in combat and other tactical, strategic, and operational missions, directly tying chaplains to the Navy's ability to defend the nation." Defs.' Mot. at 28. Under the current chaplaincy accession system, the Navy assesses its current religious needs by "consideration of the particularized needs of its individual units and installations." *Id.* at 30. The Navy "strives to recruit chaplains of various faith groups [and] does not . . . adhere to any quotas." Defs.' Mot., Ex. 14 ¶ 11; Ex. 42 ¶ 4. Instead, the Navy "aims to access only the best qualified applicants regardless of faith group." *Id.* "To determine if an applicant is the best qualified . . . a Chaplain Appointment and Recall Eligibility Advisory Group (CARE Advisory Group) meets to consider the [applicant]." *Id.* The religious denominations or faith group identification of individual applicants is "never a factor in recommendations" of the CARE group for accessions. *Id.* Rather, the Navy bases its accession system on many factors, including "the breadth of locations where Navy, Marine, and Cost Guard personnel serve; the unique circumstances of Naval service, which involve personnel on ships sailing all over the world; and the various functions and tasks of chaplain officers outside of religious services." Defs.' Mot., Ex. 16 at 3-4.

Given that it would be "impossible in any given military unit or community to provide a chaplain for each faith group represented by its members," Defs.' Mot., Ex. 15 at iv, the Navy's

36

use of a more relaxed hiring approach, which ignores faith group identifiers, seems reasonable and justified.  And given the importance of the Corps to the Navy's needs, the current program does what is possible under the circumstances to "accommodate the individual right to an appropriate degree." *Goldman*, 475 U.S. at 505.

### c.   The Plaintiffs' Suggested Alternative

The plaintiffs attempt to highlight the problems in the Navy's program by suggesting an alternative approach.  The problem for the plaintiffs, however, is that they utterly fail in suggesting a system which is equally effective at meeting the Navy's needs while also being more accommodating to the rights of either the individual plaintiffs of the average yeoman. Coupling this difficulty with the court's own inability to surmise a process better designed to more closely accommodate individual interests, the court has no reason to reject the Navy's current approach in favor of another.

The Navy possesses a generalized interest in maintaining the Chaplaincy Corps and the plaintiffs' interest in competing for a position in that Corps is not directly or inherently in conflict with the Navy's interest.  Nevertheless, the plaintiffs do not seek merely the opportunity to compete for a position in the chaplaincy.  Rather, they want to compete in a chaplaincy infused with selection criterion of their choosing.

Under the plaintiffs' proposal, the Navy should base its chaplain selection on the actual religious demographics of the Navy.[12]  Pls.' Mot. at 8.  In this way, the plaintiffs suggest, the free

---

[12]    The plaintiffs characterize an accession system based on a blending of national religious demographics and Navy religious demographics as "optimal," but fail to explain how such a blending ensures a better nexus between the chaplaincy and the religious needs of the Navy than the current system.  Pls.' Mot. at 8.

exercise needs of the Navy service members will be better accommodated.  *Id.*  To the plaintiffs, their approach would more closely tailor the Navy's chaplaincy program to the purpose for its creation (*i.e.*, the free exercise needs of Naval service members).  The plaintiffs' approach is itself flawed because it confuses religious demographics with religious need.  This is so for three principal reasons.

First, under the plaintiffs' suggested plan, numerous religious service members would have no access to clergy of their faith.  For example, according to the Navy, "if less than .27 percent of personnel identify themselves as Muslim, proportional representation would require that the Chaplain Corps be composed of only 2 Muslim chaplains.  The dispersion of religious needs across the Sea Services would indicate at least a requirement of 10 Muslim chaplains to ensure access to a chaplain of this tradition in every major geographical area."  Defs.' Mot. Ex. 14 at 6.  In short, according to the Navy, "[s]trict proportionality does not consider effectively the distribution and dispersion challenges of the Sea Services."  *Id.*

Second, the plaintiffs suggestion fails to account for the complexities and variations of religious worship among religions generally and between individual parishioners specifically. Corresponding the chaplaincy's composition to precise demographics assumes that religions each maintain an equal need for chaplains of that particular faith.  The Navy characterizes this issue as "faith specific liturgical and religious requirements."  Defs.' Mot., Ex. 15 at v.  Simply put, the plaintiffs' plan assumes that individual religious adherents share the same level of religious practice and, therefore, need for clergy.  The Navy has found, by contrast, that the disparities in beliefs and practices "make it impossible to effectuate a perfect match between chaplains of faith group clusters and the needs of sea service personnel and their families."  *Id.*, Ex. 14 at 4

38

(recognizing that "military personnel and their families who identify themselves as belonging to a particular religious tradition may or may not adhere as rigidly to the specific dogma of their stated religious denomination").

Third, the plaintiffs' recommended scheme presumes that clergy from one religious denomination are unable to cater to the religious needs of a service member from a different religious denomination. According to the Navy, however, "Protestant chaplains usually find . . . that they can serve Protestants from many denominations by incorporating elements of worship generally acceptable to Protestants." Defs.' Mot., Ex. 15 at 6. For Roman Catholics, by contrast, worship requirements and specific sacramental ministry "must be met by priests within the Roman Catholic faith group category." *Id.*

To summarize, a chaplaincy program which accurately accounts for the religious needs of the Navy (which is what the plaintiffs seek) would have to account for the various duty locations of religious service members, the religious needs of their religion generally, the religious needs of the service members specifically, and the level of accommodation that a clergy member of a different denomination, or faith for that matter, could serve to that service members. The Navy suggests that such a detailed analysis would unnecessarily "assign the Court the role of monitoring [the Navy's chaplaincy program] to ensure that accessions matched Navy demographics." Defs.' Mot. at 20. The court agrees.

If the court ordered the Navy to create a new accession system which accounted for these various complicating factors, the resulting Chaplaincy program would likely involve substantial government entanglement with religion, requiring the Navy to conduct routine surveys and studies into the religious habits and interests of its service members. *See* Pls.' Mot. at 44

39

(praying for the court to order the Navy to establish "objective criteria and procedures to identify [the Navy's] free exercise needs in the context of Defendants' operational requirements, and a plan to ensure the [chaplaincy] structure is focused on those needs and maintained through adequate accession plans"); *see also*, Defs.' Mot., Ex. 18 at I-8 & I-9.  Such entanglement would itself be susceptible to significant constitutional challenge.  *See, e.g.*, *Aguilar v. Felton*, 473 U.S. 402, 413 (1985), *rev'd on other grounds*, (noting that "pervasive monitoring by public authorities . . . infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement").

Regarding practical considerations, the Navy concluded that "the need for chaplains is not directly related to the number of adherents to denominations included under the umbrella of a faith group category."  Defs.' Mot. at 30 (citing Ex. 15 at I-6).  Instead, the Navy has "learned that in providing for the free exercise of religion, [it] must consider units or installations, rather than individuals or broad statistical representation, as the primary criterion in being able to serve the cumulative total of individual requirements most effectively."  Defs.' Mot., Ex. 15 at I-6.

Having considered the issue in depth and concluded that it is impractical to consider individual religious needs or broad statistical representations, the Navy's determination is entitled to deference by the court.  *Goldman*, 475 U.S. at 508 (asserting that the court's must give "great deference to the 'professional judgment of military authorities'").  The Navy's current system does not beget a chaplaincy that is perfectly tailored to the free exercise needs of the Navy.  Such a tailoring, however, is, according to the Navy, impossible to achieve.  And given the relaxed scrutiny applicable in cases in the military context, it is also not constitutionally required.

## IV.    CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued

on this 30th day of April, 2007.


RICARDO M. URBINA
United States District Judge