UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES E. LARSEN et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES NAVY et al.,<br><br>    Defendants. | Civil Action 02-2005  (RC) |

MEMORANDUM OPINION

After remanding this case to the district court with instructions to dismiss the plaintiffs' claims as moot, the D.C. Circuit recalled its mandate and remanded the record so that this court could indicate whether new evidence made the case newly viable.  Having considered the parties' briefing on the question in light of the Circuit's decision, the court concludes that the case remains moot.

I.  BACKGROUND

The plaintiffs allege that the United States Navy denied them commissions in its Chaplain Corps pursuant to "illegal religious quotas," Compl. ¶ 2, which they call the "Thirds Policy," *id.* ¶ 18.  Under that alleged policy, which the plaintiffs say was in place until 2001, the Navy would hire "one-third liturgical Protestants, one-third non-liturgical Protestants, and one-third divided between Catholics and adherents of 'special worship' faiths (heavily weighted towards Catholics)."  *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008).[1]  As non-liturgical

---

[1] The D.C. Circuit has explained that:

> The Navy divides its chaplains into four categories according to common faith group characteristics: Catholic, liturgical Protestant, non-liturgical Protestant, and "special

Protestants, the plaintiffs allege that the Thirds Policy "discriminated against them because it underrepresented non-liturgical Protestants in the Chaplain Corps relative to their numbers in the Navy." *Id.*

The district court dismissed several claims and one plaintiff, *see Larsen v. U.S. Navy*, 346 F. Supp. 2d 122 (D.D.C. 2004), then granted summary judgment to the Navy on the remaining plaintiffs' remaining claims, *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11 (D.D.C. 2007). On appeal, the D.C. Circuit held that it "lack[ed] jurisdiction to evaluate the merits of the district court's substantive holdings because . . . this entire case [is] moot." *Larsen*, 525 F.3d at 3. "This case is moot," the Circuit wrote, "because in their complaint plaintiffs challenged only the legality of the Thirds Policy, but even they admit that the Thirds Policy ended in 2001 and that the Navy now maintains no religious quotas." *Id.* at 4; *see also id.* at 3 ("The Navy admits that prior to 2001 it 'maintained recruiting goals for each faith group category,' Appellees' Br. 10, but asserts that since then it has given no consideration to any applicant's faith group in making hiring

---

worship." "Liturgical Protestant" refers to Protestant denominations that trace their origins to the Reformation, retain an established liturgy in their worship services, and practice infant baptism; it includes Lutheran, Episcopal, Methodist, Presbyterian, and Congregational faiths. "Nonliturgical Protestant" refers to Protestant denominations that do not have a formal liturgy or order in their worship services, that baptize only those who have reached the age of reason, and whose clergy generally do not wear religious vestments during services; it includes Baptist, Evangelical, Pentecostal, and Charismatic faiths.

*Larsen v. U.S. Navy*, 525 F.3d 1, 2–3 (D.C. Cir. 2008) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 294 (D.C. Cir. 2006) (citations omitted)). "'Special worship' refers to faith groups, both Christian and non-Christian, that have unique or special needs for their worship and religious practices; it includes Jewish, Christian Science, Seventh-Day Adventist, Mormon, Buddhist, Hindu, [Muslim], Jehovah's Witness, and Unitarian faiths." *Id.* at 3 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 295 n.3 (internal quotation marks omitted)).

decisions.").

Over plaintiffs' objections, the Circuit found the Navy's voluntary cessation of the alleged Thirds Policy sufficient to moot this case. As the court noted, "a defendant's voluntary cessation of a challenged practice moots a case only if the defendant shows that: (1) '" there is no reasonable expectation . . ."' that the alleged violation will recur,' and (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* at 4 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))). Plaintiffs argued "that the Navy flunked condition one because it failed to prove that it wouldn't reinstitute the Thirds Policy and condition two because it still uses the [Chaplain Accession and Recall Eligibility ("CARE")] Board," *id.*, "which recommends to the Chief of Chaplains whether to hire [an] applicant," *id.* at 2, and which was allegedly responsible for carrying out the Thirds Policy. "As to the first condition," the Circuit held, "because plaintiffs never allege that the Navy is likely to or even considering reinstituting the Thirds Policy, there is '"no reasonable expectation . . ."' that the alleged violation will recur.'" *Id.* at 4 (quoting *Davis*, 440 U.S. at 631 (quoting *W.T. Grant Co.*, 345 U.S. at 633) (alteration in original)). Although plaintiffs noted that "the Navy still has the authority to reinstitute the policy," *id.*, mere authority is not enough to avoid mootness. "Rather, there must be evidence indicating that the challenged [policy] likely will be reenacted." *Id.* (quoting *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (alteration in original) (citation omitted)). "The record here," the Circuit found, "contains no such evidence." *Id.* "As to condition two," the court held that "the Navy's continued use of the CARE Board is irrelevant because the Board no longer applies any type of religious quota system." *Id.* The

Circuit remanded the case to this court "with instructions to dismiss plaintiffs' claim as moot." *Id.* at 5.

Two years after that ruling, the parties jointly moved the Circuit to recall its mandate, partially vacate its opinion, and remand the record to the district court. The parties explained that plaintiffs' counsel had discovered evidence that the Navy had issued chaplain recruiting goals for certain faith groups for fiscal years 2008 and 2009. The first of those goals was issued while the case was pending on appeal, but neither party's counsel knew of them.[2] The parties agreed that the Circuit might have considered that evidence in its voluntary cessation analysis; they requested a limited remand to allow the district court to consider it first. The Circuit granted the motion in part, recalling its mandate and ordering the record "remanded to the district court to entertain and provide an indicative ruling on the voluntary cessation argument in light of the new evidence that the Navy issued FY 2008 and FY 2009 recruiting goals." Order of November 10, 2010. The Circuit deferred consideration of the motion to vacate its opinion in this case. *Id.*

## II.  LEGAL STANDARD

This case has returned to this court in an unusual posture. Because the legal effect of the newly presented evidence "is a mixed question of fact and law, which would . . . be facilitated by preliminary District Court consideration," *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1086 (D.C. Cir. 1984), the D.C. Circuit has remanded the record but limited the scope of that remand to the question of voluntary cessation. The case remains on appeal, and the Circuit

---

[2] It is troubling that the Navy, which has for many years been involved in litigation regarding the recruitment and hiring practices of its Chaplain Corps, did not alert its counsel when it issued these recruiting goals. But counsel is to be commended for taking the matter so seriously once it was brought to light, consenting to the recall of the Circuit's mandate and producing painstaking affidavits in this court.

has retained jurisdiction over it.  D.C. CIR. R. 41(b) ("If the record in any case is remanded to the district court . . . this court retains jurisdiction over the case."); *cf. Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 50 (D.C. Cir. 2005) ("While retaining jurisdiction over the case, we remand the record to the district court for the purpose of evaluating whether laches bars [plaintiff's] claim.").  On remand, the parties' arguments supplement their summary judgment briefing.  *See Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 50 n.3 (D.D.C. 2008) (noting that "the parties' . . . briefing on remand essentially amounts to supplemental briefing on their original cross-motions for summary judgment, necessitated by the D.C. Circuit's instructions on remand").  But those motions are not before this court in their entirety—only the question of voluntary cessation has been remanded.

In conducting its analysis, the court is bound by the Circuit's opinion in this case, which has not been vacated.  Under the law-of-the-case doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995); *see also LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (describing the law-of-the-case doctrine as the proposition that "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*").  When a district court hears a case on which the court of appeals has previously ruled, "an even more powerful version of the doctrine," which is "sometimes called the 'mandate rule,'" applies.  *Barry*, 87 F.3d at 1393 n.3.  That strong form of the law-of-the-case doctrine "requires a lower court to honor the decisions of a superior court in the same judicial system," *id.*, because "[t]he decision of a federal appellate court establishes the law binding further litigation by another body subject to its authority," *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977).  The mandate rule "forecloses relitigation

of issues expressly or impliedly decided by the appellate court." *United States v. Susi*, 674 F.3d 278, 283 (4th Cir. 2012) (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993)). This court will therefore make its indicative ruling within the narrow compass described by the remand order and the mandate rule.

### III.  ANALYSIS

**A.  Mootness, Voluntary Cessation, and the Wrong Originally Alleged**

"It is a well-recognized principle that a case will not become moot merely because a defendant agrees voluntarily to cease engaging in the challenged conduct, as there remains a risk that the defendant will merely resume the challenged conduct after the case is dismissed." *Wash. Legal Found. v. Henney*, 202 F.3d 331, 336 (D.C. Cir. 2000). Courts are not "'compelled to leave "[t]he defendant . . . free to return to his old ways."'" *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953))) (alterations in *Mesquite*). Instead, "a defendant's voluntary cessation of a challenged practice moots a case only if the defendant shows that: (1) '" there is no reasonable expectation . . ."' that the alleged violation will recur,' and (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Larsen*, 525 F.3d at 4 (quoting *Davis*, 440 U.S. at 631 (quoting *W.T. Grant Co.*, 345 U.S. at 633)). "The burden of establishing mootness rests on the party that raises the issue. It is a 'heavy' burden." *Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) (quoting *Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989)) (citation omitted); *see also Laidlaw*, 528 U.S. at 189 ("The 'heavy burden of persuad[ing]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (quoting

*United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968) (alteration in *Laidlaw*))).

When "voluntary cessation analysis governs our mootness inquiry," *Nat'l Black Police Ass'n*, 108 F.3d at 349, the court must "defin[e] the wrong that the defendant is alleged to have inflicted. What . . . are the 'old ways' to which the voluntarily ceasing defendant might return?" *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990) (en banc) (quoting *W.T. Grant Co.*, 345 U.S. at 632). As the D.C. Circuit has observed, when performing this analysis "[t]he opportunities for manipulation are great. The more broadly we define the wrongful conduct, the more numerous are the possible examples" of it. *Id.* To discipline the inquiry, the Circuit has said that "where plaintiffs are resisting a mootness claim . . . they must be estopped to assert a broader notion of their injury than the one on which they originally sought relief." *Id.* "[T]he wrong at issue for mootness purposes is [therefore] defined by the plaintiffs' theory set forth in the complaint," which should be read with a "focus[] on identifying the factors that were 'essential to plaintiffs' original theory of their claim . . . .'" *Del Monte Fresh Fruit Produce Co. v. United States*, 570 F.3d 316, 323 (D.C. Cir. 2009) (quoting *Clarke*, 915 F.2d at 704).

The D.C. Circuit has already construed the plaintiffs' complaint; its interpretation is the law of this case. On the Circuit's reading, the complaint "challenged only the legality of the Navy's alleged Thirds Policy," *Larsen*, 525 F.3d at 4, which "discriminated against [the plaintiffs] because it underrepresented non-liturgical Protestants in the Chaplain Corps relative to their numbers in the Navy," *id.* at 3. The Circuit rejected the argument that the plaintiffs challenged anything other than the Thirds Policy. *Id.* at 5 (ruling that plaintiffs did not "challenge the Navy's current hiring policy as well as its Thirds Policy"). If the plaintiffs included such a challenge in their complaint, they abandoned it on appeal. *Id.* The Circuit held

that the complaint's reference to "the Navy's chaplain accession goals" and its allegation that "[t]he Navy has established and maintained an unconstitutional religious quota system" only implicated the Thirds Policy.  *Id.* (quoting Compl.) (alteration in original).

The plaintiffs urge this court to adopt a far broader reading of their complaint.  First, they argue that they have challenged more than the Thirds Policy, which "was only a manifestation of the Navy's ability to arbitrarily change its accession policy and faith group goals."  Pls.' Remand Br. at 17.³  Plaintiffs argue that the scope of their challenge, properly construed, "was and is the Navy's failure to have an objective basis for determining the Navy's chaplain requirements by faith group."  *Id.* at 20.  Anything other than an "objective" system, plaintiffs contend, requires the Navy to adopt "arbitrary faith group accession goals"—and they say they have challenged all such arbitrary goals.  In the alternative, plaintiffs argue that even if they have challenged only the Thirds Policy and not all "arbitrary faith group accession goals," that policy is not merely "a division into three [faith] groups, with fixed percentages," but rather includes any attempt "to structure the Chaplain Corps' composition contrary to the national and Navy religious demographics, in a manner that ke[eps] control of the Chaplain Corps in the hands of the liturgical faith groups . . . and marginalized [n]on-liturgicals . . . ."  Pls.' Remand Reply at 10.

The Circuit's opinion forecloses both arguments.  As that court ruled, the plaintiffs have "challenged only the legality of the Navy's alleged Thirds Policy," *Larsen*, 525 F.3d at 4, under which the Navy would hire "one-third liturgical Protestants, one-third non-liturgical Protestants, and one-third divided between Catholics and adherents of 'special worship' faiths (heavily weighted towards Catholics)," *id.* at 3.  That is the law of this case, as is the mootness of the

---

² When the Chaplain Corps brings an individual into the Navy as a commissioned officer, it says that the officer has been "accessed."  Decl. of Capt. Johnny W. Poole, May 20, 2011 ("Poole Decl."), ¶ 3.

plaintiffs' claims on the evidence originally presented. This court's only task is to determine whether the new evidence presented on remand has rendered the case no longer moot.

### B. New Evidence Presented on Remand

In July 2007, the Navy issued officer recruiting goals for fiscal year 2008. The letter accompanying that release stated that the "Navy desires to have a Chaplain Corps which reflects and is representative of the naval community it serves." Decl. of Diana L. Meehan, May 20, 2011 ("Meehan Decl."), Ex. F (Fiscal Year 2008 Officer Recruiting Goals, July 1, 2007 ("FY 2008 Goals Letter")), at 2. To that end, the letter recorded, the "Commander, Navy Recruiting Command . . . adjusts marketing and recruiting efforts to achieve [the] targets delineated in enclosure (2)." *Id.* That enclosure, entitled "Chaplain Community FY-08 Recruiting Goals," set goals for the number of chaplains to be accessed per denomination or faith group: Protestant, 49; Roman Catholic, 14; Muslim, 2; Orthodox (Eastern), Buddhist, Latter-Day Saints, Jewish, 1 each; and Other, 2. *Id.*, Encl. 2 ("FY 2008 Goals").[4] Those goals did not distinguish between liturgical and non-liturgical Protestants, as the alleged Thirds Policy had done. The enclosure noted that the "[s]pecific goals" listed there "do not preclude representatives from religious organizations outside those listed from accessing." *Id.*

The Navy issued similar recruiting goals for fiscal year 2009. The letter describing those goals again stated that the "Navy desires to have a Chaplain Corps that reflects and is representative of the naval community it serves," and that the Commander, Navy Recruiting Command should therefore "adjust marketing and recruiting efforts to achieve [the] targets

---

[3] The enclosure provided goals for both direct and recall accessions—that is, accessions from the civilian population and the reserve community, respectively, Poole Decl., ¶ 3—as well as transfers from other branches of the military. *See* FY 2008 Goals. The direct and recall accession goals are combined here. The enclosure also set a goal of two inter-service transfers, but did not specify a faith group or denomination for those transfers.

delineated in enclosure (2)." Meehan Decl., Ex. G (Fiscal Year 2009 Officer Recruiting Goals, July 9, 2008 ("FY 2009 Goals Letter")), at 2. That enclosure, entitled "Chaplain Community FY-09 Recruiting Goals," similarly articulated those goals by number of chaplains to be accessed per denomination or faith group: Protestant, 37; Roman Catholic, 14; Muslim, 2; Orthodox (Eastern), 2; Jewish, 1; and Others, 1. *Id.*, Encl. 2 ("FY 2009 Goals").[5] It did not set out separate goals for liturgical and non-liturgical Protestants, as the alleged Thirds Policy had done. The fiscal year 2009 document also noted that the "[s]pecific goals" listed there "do not preclude representatives from religious organizations outside those specifically listed from accessing." *Id.*

When Captain Diana Meehan, the chaplain programs manager and a commander in the Navy Recruiting Command, distributed the fiscal year 2008 recruiting goals she emphasized that the recruiting goals did not limit chaplain accessions. In an email to the officers who oversaw recruiting, Capt. Meehan wrote:

> Attached is the FY-08 Chaplain Recruiting Goaling Letter. This does not mean that you can only recruit to those denominations listed. What I am asking our chaplain recru[i]ters in the field to do is to also focus on the specific under-represented faith groups as identified in this attached list. Note that these specific goals do not in any way preclude representatives from religious organizations outside of those listed from accessing.

Meehan Decl., Ex. H. In a declaration presented here, Ms. Meehan states that "the [recruiting] goals . . . did not equate to hard and fast quotas in any way," but instead were "intended to be viewed more as targets to get recruiters to make a conscious effort to recruit to diversity." Meehan Decl., ¶ 21. Captain Kenneth J. Barrrett, who served as diversity director in the Office

---

[4] The enclosure again provided goals by denomination or faith group for both direct and recall accessions, which are combined here, as well as one inter-service transfer. The enclosure did not specify a faith group or denomination for that transfer.

of the Chief of Naval Personnel and "provided guidance" on the recruiting goals, Decl. of Kenneth J. Barrett, May 19, 2011 ("Barrett Decl."), ¶ 6, offers a similar account, as does Captain Johnny W. Poole, the executive assistant to the Chief of Chaplains. Capt. Poole states that "the fiscal year 2008 Recruiting Goals included a particular focus on recruiting toward diversity," Poole Decl. ¶ 11, by which he seems to mean religious diversity. Capt. Barrett affirms that "one key element of diversity in the Navy is diversity of religious beliefs and practices," Barrett Decl. ¶ 18, and that the fiscal year 2008 and 2009 chaplain recruiting goals "were created to afford recruiters the opportunity and encouragement to focus recruiting assets on particular needs," *id.* ¶ 19. Specifically, Capt. Barrett says that his office identified an apparent "shortfall of Roman Catholic priests and Muslim clerics" in the Chaplain Corps and determined that too "few applications [were] coming from these faith groups." *Id.* ¶ 20. The Navy therefore set goals to encourage Navy recruiters to solicit applications from those and other under-represented groups. Poole Decl. ¶ 15; Barrett Decl. ¶ 21.

Captains Barrett, Meehan, and Poole all emphasize that recruiting and accession were distinct processes, and that the recruiting goals played no role in the decisions about whether the Navy would hire a particular chaplain. Barrett Decl. ¶ 15 ("The efforts to build and maintain diversity through recruiting do not extend to the accession process . . . . The Recruiting command does not select the applicants in the Chaplain Community."); Meehan Decl. ¶ 14 (stating that once a recruit's application has been fully prepared, "I and my [staff] have no role in the process of recommending applicants for selection to be accessed into the Chaplain Corps"); Poole Decl. ¶ 15 (declaring that the recruiting goals "had no bearing on . . . the actual accession decisions"). Recruiters were responsible for determining whether a potential applicant met the minimum qualifications for the Navy chaplaincy, Meehan Decl. ¶¶ 10–11, and for helping

11

applicants complete their applications and submit the proper documentation, *id.* ¶ 12.  Recruiters also interviewed the applicants and submitted an appraisal of them.  *Id.*  The completed applications were then submitted to the CARE Advisory Group, which examined the applications and selected the best-qualified applicants.  Poole Decl., Ex. A (OPNAV Instruction 1120.9, Appointment of Officers in the Chaplain Corps of the Navy, Dec. 20, 2005), at 6 ("The CARE Advisory Group shall review an applicant's academic performance, graduate theological education, professional experience, professional reputation, interviews by a recruiting officer and a chaplain, and letter of personal or professional recommendation; and shall ensure that an ecclesiastical endorsement has been submitted for each applicant."); Meehan Decl., Ex. D (Chief of Chaplains Instruction 1110.1H, Chaplain Appointment and Retention Eligibility Advisory Group, May 8, 2007), at 2 ("The CARE Advisory Group ensures that the full spectrum of professional prerequisites is considered for each Navy chaplain applicant.  The CARE Advisory Group ensures that applicants who are proffered a commission to serve as a chaplain are the best qualified and not simply those who meet minimum requirements.").  The CARE Advisory Group did not attempt to meet the accession goals that were issued to Navy recruiters.  Poole Decl., ¶ 15 ("[N]othing prevents the CARE Advisory Group from accessing any candidate from a particular faith group or faith group cluster if that applicant is fully qualified; in fact . . . accessions are made solely on the basis of the best-qualified standard and do not take faith group or faith group category into account.");  Barrett Decl, ¶¶ 16–17 (The "Navy continues to use the best and fully qualified standard to access all applicants regardless of race, ethnicity, gender or religious affiliation.  The diversity aspects of the recruiting goals were incorporated to increase applications in underrepresented areas, but in no way were created to direct, regulate or limit the accessions process.").  Although the Naval Recruiting Command makes the final decision on

whether to access a particular candidate, Capt. Meehan does not believe that it rejected any applicant selected by CARE Advisory Group while the fiscal year 2008 and 2009 recruiting goals were in effect.  Meehan Decl., ¶ 16.

Having reviewed the evidence presented on remand, the court now evaluates its legal effect.

### C.  Effect of the New Evidence

The plaintiffs offer two main arguments that the Navy's chaplain recruiting goals save their case from mootness.  First, they argue that the Navy's desire to "have a Chaplain Corps which reflects and is representative of the naval community it serves," FY 2008 Goals; *see* FY 2009 Goals (trivial difference), necessarily requires the Navy to set faith group goals for recruiting and accessions—and that, to pass constitutional muster, those goals must be set by reference to some objective standard.  Because, the plaintiffs argue, they have challenged the lack of such objective standards in the Navy's chaplain recruiting process—its power (and alleged proclivity) to set "arbitrary faith group accession goals"—the Navy's promulgation of goals that require objective standards demonstrates the continuing viability of the plaintiffs' suit.  Next, plaintiffs argue that the recruiting goals "are a manifestation of the Thirds Policy at work." Pls.' Remand Br. at 23.  Those goals, say the plaintiffs, resemble the proportions of the Thirds Policy, except that liturgical and non-liturgical Protestants have been combined into one group accounting for roughly two-thirds of the total.  They argue that the goals overstate the need for Catholic chaplains and, by conflating all Protestants in one category, ignore the specific demand for non-liturgical Protestant chaplains.  Because the recruiting goals so closely resemble the alleged Thirds Policy, the plaintiffs contend, they show that the Navy intends to reinstitute that policy—indeed, that it may already have done so.

In its briefing, the Navy places a heavy emphasis on the difference between the recruiting and accession processes. The Navy argues that although it provided its recruiters with goals articulated in terms of accessions by faith group and denomination, the recruiting goals cannot give new life to the plaintiffs' case because recruiters did not play any role in the final accession decisions. The Navy further argues that even if the recruiting goals indirectly affected accession decisions, they did not represent a return of the alleged Thirds Policy because they were differently structured and especially because they did not advantage liturgical Protestants over their non-liturgical brethren. This last argument is persuasive.

The plaintiffs' first argument is easily dismissed, the Navy's somewhat less easily. As discussed above, the Circuit construed the plaintiffs' complaint as a challenge to the Navy's alleged Thirds Policy. The plaintiffs cannot now reframe their suit in terms of the Navy's need for objective accession goals and its reliance on supposedly arbitrary goals. The Navy's argument that the recruiting goals are irrelevant because of the separation between the recruiting and accession processes is more powerful. The plaintiffs "allege that until 2001 the Navy had a policy of *hiring* one-third liturgical Protestants, one-third non-liturgical Protestants, and one third divided between Catholics and adherents of 'special worship' faiths (heavily weighted towards Catholics)." *Larsen*, 525 F.3d at 3 (emphasis added). The recruiting goals, the Navy argues, were not a hiring policy. Hiring decisions were made by the CARE Board, which applied religiously neutral criteria. To prove its point, the Navy cites the actual accession statistics from the fiscal years in question. In fiscal year 2008, non-liturgical Protestants accounted for 44% of all chaplain accessions, and liturgical Protestants 37%. Decl. of Veronica Berto, May 20, 2011 ("Berto Decl."), Ex. 3. Together, 81% of accessed chaplains were Protestant, *id.*, though the recruiting goals set a target of 69%, *see* FY 2008 Goals. In fiscal year

14

2009, non-liturgical Protestants made up 65% of chaplain accessions and liturgical Protestants 26%, for a total of 91%. Berto Decl., Ex. 3. The recruiting goals indicated a target of 65%. *See* FY 2009 Goals.

    If the recruiting goals were hiring quotas, as the plaintiffs contend, they were notably ineffective ones. But there is some evidence that the Navy intended its recruiting practices to shape its hiring decisions. To begin with, the CARE Board is obviously limited to hiring the candidates presented to it—and so practices that affect the candidate pool necessarily affect chaplain accessions. The Navy's argument to the contrary is somewhat paradoxical: a recruiting practice with no impact on candidate hiring is pointless. The fact that the recruiting goals were articulated in terms of actual accessions only strengthens the connection between the two. In fiscal year 2008, for example, recruiters were told to perform their duties so that one Buddhist chaplain would be accessed that year. *See* FY 2008 Goals. A recruiter under such a mandate would presumably search for strong Buddhist candidates; the presence of such candidates in the pool of applications considered by the CARE Board would increase the likelihood that a Buddhist chaplain was actually accessed. When the recruiting goal letters say that the "Commander, Navy Recruiting Command . . . adjusts marketing and recruiting efforts to achieve [the] targets delineated in enclosure (2)," FY 2008 Goals Letter; *see* FY 2009 Goals Letter (trivial differences), they are describing the natural response to recruiting goals. The letters speak of "Chaplain accession goal[s]" and "quotas," FY 2008 Goals Letter; FY 2009 Goals Letter, and there is little reason to doubt them—even if the recruiters attempting to meet those goals did not have the final say in the matter.

    The Navy's promulgation of recruiting goals articulated in terms of actual accessions raises a difficult question that the court need not resolve. On the one hand, the CARE Board

used neutral selection criteria to make the ultimate hiring decisions. On the other hand, the Navy instructed its recruiters to work to produce particular hiring patterns. Are recruiting goals phrased as accession goals enough to unmoot a case premised on the existence of hiring quotas? The court need not decide, because the accession goals that the Navy set for its recruiters did not discriminate against non-liturgical Protestants as the Thirds Policy is alleged to have done—and that fact decides this case. As the D.C. Circuit explained, the plaintiffs' case has always concerned the allegation that the Thirds Policy "discriminated against them because it underrepresented non-liturgical Protestants in the Chaplain Corps relative to their numbers in the Navy." *Larsen*, 525 F.3d at 3. That is, "the Navy illegally refused to hire them because they are non-liturgical Protestants." *Id.* at 2. In their briefing on remand, the plaintiffs continue to press this argument, alleging that the Navy has historically sought to maintain a majority of Catholics and liturgical Protestants in its Chaplains Corps, Pls.' Remand Reply at 1, by hiring "in a manner that kept control of the Chaplain Corps in the hands of the liturgical faith groups . . . and marginalized [n]on-liturgicals," *id.* at 10. The recruiting goals set targets of 69% Protestants in fiscal year 2008 and 65% in fiscal year 2009. Needless to say, both of those numbers approximate the two-thirds of chaplain accessions allegedly allocated to Protestants under the Thirds Policy, but they do not suggest the even division between liturgical and non-liturgical candidates that was a central feature of that alleged policy. (As discussed above, when accessions were ultimately made Protestant chaplains were hired in numbers exceeding the targets, and the substantial majority of those Protestant chaplains were non-liturgical.) The recruiting goals cannot plausibly be interpreted as an effort to ensure that only one-third of the hired chaplains were non-liturgical Protestants. That fact is fatal to the plaintiffs' case, as a final examination of the Circuit's opinion makes clear.

The D.C. Circuit concluded that there was no reasonable expectation that the alleged Thirds Policy would recur because there was no evidence that the policy would likely be reenacted, "the Navy has never said that it will reenact the Thirds Policy, and plaintiffs have not even alleged as much." *Larsen*, 525 F.3d at 4.  The last two points remain as true as they were when the Circuit issued its opinion: the Navy has not said that it will reenact the Thirds Policy and the plaintiffs have not alleged as much.  Their allegation that the Navy will continue to use "arbitrary faith group accession goals" is not to the contrary, since their challenge is not pointed at all such goals: the plaintiffs cannot redefine the Thirds Policy in order to allege that the Navy will reenact it.  Nor does the evidence newly presented here indicate that the Thirds Policy will likely be reenacted.  Even the most liberal reading of the recruiting goals do not suggest a likelihood that the Navy will some day limit its hiring of non-liturgical Protestant chaplains to approximately one-third of all chaplain accessions, as the plaintiffs have alleged that the service once did.  That allegedly discriminatory limit is the core wrong that the plaintiffs have challenged, but it is absent from the evidence they have presented here.

As to the second factor in the voluntary cessation analysis, the Circuit rejected plaintiffs' argument that the Navy's continued use of the CARE Board—which allegedly carried out the Thirds Policy—meant that the effects of the alleged violation had not been completely and irrevocably eradicated.  "[T]he Navy's continued use of the CARE Board is irrelevant," the Circuit wrote, "because the Board no longer applies any type of religious quota system." *Larsen*, 525 F.3d at 4.  In fiscal years 2008 and 2009, this statement remained true: the Board itself continued to choose among the candidates presented to it through a religiously neutral decision-making process.  Although the candidates presented to the Board affect the choices that it can make, no plausible interpretation of the recruiting goals would conclude that they gave Navy

17

recruiters an incentive to provide the Board with a pool of candidates that would lead it to hire only one-third non-liturgical Protestants—the core feature of the alleged Thirds Policy, at least as it pertains to the plaintiffs in this case.  A recruiter attempting to meet her goals could have aimed to have the Board fill a new class of chaplains with as many as two-thirds non-liturgical Protestants; the Board in fact hired 55% non-liturgical Protestants in the years in question.  Such a system does not suggest that the alleged Thirds Policy was reinstated or even that its effects still linger.  And the lack of such evidence makes the plaintiffs' claims moot.

## IV.  CONCLUSION

The Navy's chaplain recruiting goals for fiscal years 2008 and 2009 did not—and were not intended to—limit the number of non-liturgical Protestants to approximately one third of new hires.  Because that limitation was always the core of the plaintiffs' allegations, their case remains moot.

If the Circuit vacated its opinion and remanded this case in full, this court would dismiss it as moot for the reasons stated above.  The Clerk of the court is **DIRECTED** to transmit a copy of this memorandum opinion to the Court of Appeals, which requested the indicative ruling.

Rudolph Contreras  
United States District Judge

Date: August 28, 2012